# Exhibit 16

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
PAGES 131 - 143 HAVE BEEN MARKED "CONFIDENTIAL"

| | |
|---|---|
| WEBLOYALTY.COM, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. 04-0090 (KAJ) |
| ) | |
| CONSUMER INNOVATIONS, LLC, ) | |
| ) | |
| Defendants. ) | |

Videotape deposition of MATTHEW GORDON taken pursuant to notice at the law offices of Morris, Nichols, Arsht & Tunnell, 1201 North Market Street, Wilmington, Delaware, beginning at 8:00 a.m. on Tuesday, July 27, 2004, before Lucinda M. Reeder, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

    STEVEN LIEBERMAN, ESQ.
    ROTHWELL, FIGG, ERNST & MANBECK, P.C.
      1425 K Street, N. W. - Suite 800
      Washington, D.C.  10005
      for the Plaintiff

    DANIEL A. GRIFFITH, ESQ.
    MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
      1220 Market Street - 5th Floor
      Wilmington, Delaware  19801
      for the Defendant

ALSO PRESENT:

  JASON EDWARDS


- - - - - - - - - - - - - - - - - - - - - - - -
WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
(302) 655-0477

Matthew Gordon                                                          25

1    Q.   And describe for me the general process that
2    you used in designing the sell pages.
3    A.   I -- typically, when I would design a page, I
4    would sketch out something on a piece of paper of how
5    I hoped the layout should look.  I then wrote the text
6    copy.  And depending on the sell page we were looking
7    at by product, I would gather the graphics that we
8    might have from our benefit providers or we would talk
9    about with our graphic designers what kind of -- what
10   kind of graphics we would like to be displayed on the
11   page.
12   Q.   And what would you do after that?
13   A.   I'm not sure I understand.
14   Q.   Well, you said you would sketch the layouts.
15   You would write text copy.  You'd gather graphics from
16   benefits providers or your own graphics people.  What
17   happened next?
18   A.   Okay.  I would supply that to our independent
19   contractor who was HungryMind.  They would code it
20   together in HTML and get it ready for the web.  We
21   would make any revisions if necessary.  And that would
22   be it.
23   Q.   Let me show you what has previously been marked
24   for identification as Webloyalty Deposition Exhibit 4.

Matthew Gordon                                                45

```
 1     Q.    Did you do any research to ascertain what kind
 2   of creatives Webloyalty was using for the Walter Drake
 3   post-transaction marketing?
 4     A.    I ran through the whole process from Walter
 5   Drake.
 6     Q.    What does that mean?
 7     A.    I purchased something from Walter Drake.  I
 8   then enrolled in the Webloyalty service.
 9     Q.    When did you do that?
10     A.    November, December.
11     Q.    What name did you use?
12     A.    My name.
13     Q.    Did you print out the various screen shots from
14   this process?
15     A.    I didn't.
16     Q.    Did you store them on your computer?
17     A.    I didn't.
18     Q.    How did you save them?
19     A.    I didn't.
20     Q.    Did you take notes?
21     A.    I don't think so.
22     Q.    Do you have a photographic memory?
23     A.    No.
24     Q.    Do you have sort of an extraordinarily good
```

Matthew Gordon                                              46

1    memory?
2            MR. GRIFFITH:  Objection to the form.
3    Q.   Or just sort of your average memory?
4            MR. GRIFFITH:  Objection to the form
5    again.
6    A.   I would say I have an average memory.
7    Q.   Did you -- withdrawn.  Which club did you join
8    for -- from Webloyalty?
9    A.   Reservation Rewards.
10   Q.   That's the Webloyalty travel program?
11   A.   I guess it's their travel program because they
12   have other components in it that's nontravel related,
13   I think.
14   Q.   Did you use any of the services?
15   A.   I didn't.
16   Q.   Why did you run through the Walter Drake post-
17   transaction process with Webloyalty and join
18   Reservation Rewards?
19   A.   I wanted to see how the process worked.  I
20   wanted to see the creative that was approved by Walter
21   Drake.  I wanted to see what kind of messages were
22   sent around.  I wanted to do a competitive analysis on
23   the program itself of Webloyalty.
24   Q.   Were there any documents generated by your

Matthew Gordon                                                47

1    purchasing of something at the Walter Drake site and
2    then joining Reservation Rewards?
3        A.   There was, I think -- I got a welcome e-mail.
4        Q.   Did you keep that?
5        A.   No.
6             MR. LIEBERMAN:  We have to flip the tape.
7             THE VIDEOGRAPHER:  We're going off the
8    record at approximately 8:55 a.m.
9                  --  --  --  --
10            THE VIDEOGRAPHER:  We're back on the
11   record at approximately 8:59 a.m.
12   BY MR. LIEBERMAN:
13       Q.   So are there any documents that exist in CI's
14   files or your files -- by that I include computers --
15   reflecting your running through the Walter Drake
16   process, obtaining the Webloyalty post-transaction
17   banner and sell page, and then the various
18   communications with Webloyalty regarding Reservation
19   Rewards?
20       A.   No, there wasn't.  I think they sent two more
21   follow-up e-mails over the course of time I was
22   enrolled in the program.  I would read through it and
23   I would delete it.
24       Q.   Why didn't you keep copies of any of those

Matthew Gordon                                                        48

```
 1    documents or screen shots?
 2       A.   Just anal about how I conserve information,
 3    space on my computer.
 4       Q.   Did you print out the Webloyalty sell page at
 5    any point in time?
 6       A.   No.
 7       Q.   Did you store it at any point in time in your
 8    computer?
 9       A.   No, I didn't.
10       Q.   Do you remember the precise date that you ran
11    through this?
12       A.   November, December of 2003.
13       Q.   Was it before the December 17 IO?
14       A.   I can't recall for sure.
15       Q.   Tell me about this implementation phone call.
16    Was that the first communication you had directly with
17    Walter Drake?
18       A.   Yes.
19       Q.   Who was on the call?
20       A.   Myself, Kate Heslin, and I believe the only
21    other participant was Barbara Krystin from Walter
22    Drake.  I don't know how to pronounce her name.
23    Krystin.
24       Q.   About when did that take place?
```

Matthew Gordon                                            53

1      Q.   Yes.
2      A.   I did.
3      Q.   Describe the process of how you designed
4   Exhibit 3.
5      A.   Well, I took the meat of our program, which is
6   the core benefits of our program, laid it out on a
7   piece of paper, drew out a sketch of what I think the
8   program should look like based on creatives that I had
9   produced in the past and filled in the introduction
10  copy and the closing copy, put on the membership
11  terms, and put on the post fields for the consumer to
12  put on the information.  Sent it all over to our
13  graphics designer.  They coded it in HTML.  Went
14  through a couple of revisions and came up with this
15  creative.
16     Q.   How did you send this material to your graphics
17  designer?
18     A.   I sent the text for it via Word document, and
19  we probably talked about the layouts over the phone.
20     Q.   Did you send them a sketch of the layouts, do
21  you think?
22     A.   No.
23     Q.   What happened to the Word document that you
24  sent to the designers?

Matthew Gordon                                                54

```
 1     A.    I think we provided it to you.
 2     Q.    Could you look through Exhibit 2, which is a
 3   complete set of the documents provided by CI in this
 4   case, and let me know if that text document is there?
 5     A.    Yes, it is here.
 6     Q.    What's the Bates number on it?
 7     A.    C1032.
 8     Q.    Did you have any discussions with the graphics
 9   designer about the Webloyalty Reservation Rewards
10   enrollment or sell page?
11     A.    No.
12     Q.    The graphics designer that you've sent this
13   text to was the HungryMind people?
14     A.    Correct.
15     Q.    Which people at HungryMind?
16     A.    Hank Pantier and Jeffrey Lindermier.
17     Q.    Did you tell the people from HungryMind that
18   you wanted them to make the page look like the
19   Webloyalty Reservation Rewards page?
20     A.    No, I didn't.
21     Q.    Did you tell them to take a look at the
22   Webloyalty Reservation Rewards page?
23     A.    No, I didn't.
24     Q.    Did they ever tell you that they had looked at
```

Matthew Gordon                                                    55

1   the page?
2   A.  We went through the process to go through how
3   we would transfer the data back and forth.  But I
4   don't think specifically that they looked at the page.
5   But we talked about what would happen with the process
6   of it, meaning, that someone would pop up, see an
7   offer; if they clicked "yes," a transaction would
8   happen behind the scenes that would report information
9   back to Walter Drake that someone wanted to enroll in
10  a program.  Based on that, the billing information
11  would be released back to us.
12  Q.  Right.  Is it -- withdrawn.  In the
13  communications you had with the HungryMind people, did
14  you ever mention to them the Webloyalty Reservation
15  Rewards sell or enrollment page?
16  A.  I doubt it.
17  Q.  Did they ever indicate to you that they were
18  going to look at that page?
19  A.  No.
20  Q.  Did you ever tell them to go look at the page?
21  A.  No.
22  Q.  Did you ever tell them I'd like to you make our
23  page, meaning CI's page, look like the Webloyalty
24  page?

Matthew Gordon                                                        56

1    A.    No, I didn't.
2    Q.    If they had said to you, Matt, I'd like to make
3    the Traveler Innovations sell page look just like the
4    Webloyalty page, what would your reaction have been?
5          MR. GRIFFITH:  Objection to the form.
6    It's a hypothetical --
7    A.    I don't know.
8    Q.    Well, how would you have reacted to that?
9          MR. GRIFFITH:  Objection to the form.  He
10   just answered that.
11   A.    It wouldn't have happened.
12   Q.    Why not?
13   A.    I don't know why it wouldn't have happened.  It
14   wouldn't have happened.
15   Q.    Why wouldn't it have happened?
16         MR. GRIFFITH:  Objection to the form.
17   Again, calls for speculation.
18   A.    Because that's not what their -- their job is
19   to design the creatives with my direction.  They
20   wouldn't ask -- give direction to me on how to do it.
21         MR. LIEBERMAN:  Can I have that back
22   please?
23         (The reporter read as requested.)
24   BY MR. LIEBERMAN:

Matthew Gordon                                                  108

1           MR. GRIFFITH:  Objection to the form.
2      A.   Can you repeat that?
3           MR. LIEBERMAN:  Read it back, please.
4           (The reporter read as requested.)
5           THE WITNESS:  Yes.
6  BY MR. LIEBERMAN:
7      Q.   How do you account for the fact that that
8  paragraph magically appeared in the final version of
9  the Traveler Innovations creative?
10          MR. GRIFFITH:  Objection to the form.
11     A.   It was just a modification that was made to the
12 creative.
13     Q.   Do you have any explanation as to how you put
14 in a paragraph which exactly quoted the language from
15 the Webloyalty creative, except with those two
16 changes?
17          MR. GRIFFITH:  I object to form.  He
18 already explained it.
19     A.   No, I don't.  This is the creative that we
20 produced.
21     Q.   This is the paragraph that came out of your
22 head?
23     A.   Correct.
24     Q.   We now have seven examples of changes from your

Matthew Gordon                                      109

1    draft which was sent to List Services on December 19
2    which mirror language from the Webloyalty creative,
3    Exhibit 5.  Correct?
4              MR. GRIFFITH:  Objection to the form.
5    They speak for themselves, the changes.
6    Q.   You may answer.
7    A.   It would seem that way, yes.
8    Q.   Tell me about the next communication you had
9    directly or indirectly with Walter Drake.
10   A.   It was to notify them of the lawsuit and then
11   request an insertion order that they had.
12   Q.   And how did you communicate with them?
13   A.   Well, I was advised by the counsel to try and
14   get the insertion order that was signed between Walter
15   Drake and List Services.  I first began talking with
16   Kate Heslin, trying to acquire it from Walter Drake.
17   They looked through their records.  They did not have
18   a signed copy of a documentation between List Services
19   and Walter Drake.  I asked her if one existed.  She
20   said she wasn't sure.  I needed to get the
21   documentation, so we could gather our information.  So
22   I asked Kate if I could contact Barbara directly to
23   try and acquire it, and then via phone calls with
24   Barbara, I discussed it with her.

37