IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WEBLOYALTY.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-90-KAJ |
| | ) | |
| CONSUMER INNOVATIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW SUBMITTED BY PLAINTIFF WEBLOYALTY.COM, INC.**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
*Attorneys for Plaintiff
Webloyalty.com, Inc.*

OF COUNSEL:

Steven Lieberman
Anne M. Sterba
Rothwell, Figg, Ernst & Manbeck
1425 K Street, NW
Suite 800
Washington, DC 20005
(202) 783-6040

March 16, 2005

i

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| TABLE OF CITATIONS |  | iii |
| SUMMARY OF THE NATURE OF THE CASE |  | 1 |
| FINDINGS OF FACT |  | 1 |
| A. | THE PARTIES | 1 |
| B. | THE CLAIMS | 2 |
| C. | PROCEDURAL HISTORY | 2 |
| D. | COPYRIGHT INFRINGEMENT OF THE WEBLOYALTY SELL PAGE | 3 |
| E. | COPYRIGHT INFRINGEMENT OF THE WEBLOYALTY BANNER | 7 |
| F. | WILLFULNESS | 9 |
| G. | UNFAIR COMPETITION – TRADE DRESS INFRINGEMENT OF THE WEBLOYALTY SELL PAGE AND BANNER ADVERTISEMENT. | 10 |
| H. | ACTUAL DAMAGES | 11 |
| CONCLUSIONS OF LAW |  | 12 |
| A. | CI INFRINGED WEBLOYALTY'S VALID COPYRIGHT REGISTRATIONS FOR THE WEBLOYALTY SELL PAGE AND WEBLOYALTY BANNER. | 12 |
| B. | CI's INFRINGEMENT OF WEBLOYALTY'S BANNER AND SELL PAGE COPYRIGHT REGISTRATIONS WAS WILLFUL. | 15 |
| C. | CI'S USE OF WEBLOYALTY'S SELL PAGE AND BANNER ADVERTISEMENT CONSTITUTE WILLFUL INFRINGEMENT OF WEBLOYALTY'S TRADE DRESS. | 16 |
| D. | WEBLOYALTY IS ENTITLED TO THE MAXIMUM AMOUNT OF STATUTORY DAMAGES ALLOWED UNDER THE COPYRIGHT ACT. | 20 |

ii

E.    WEBLOYALTY IS ENTITLED TO ATTORNEYS' FEES
      UNDER THE COPYRIGHT ACT.                                    22

F.    WEBLOYALTY IS ENTITLED TO TREBLED ACTUAL
      DAMAGES UNDER THE LANHAM ACT.                               24

G.    INJUNCTIVE RELIEF                                           25

iii

# TABLE OF CITATIONS

<u>Page(s)</u>

<u>Cases</u>

<u>A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,</u>
    237 F.3d 198 (3rd Cir. 2002)                                 19

<u>Almond Int'l Inc. v. Arpas Int'l Ltd.,</u>
    1999 U.S. Dist. LEXIS *102170 (S.D.N.Y. July 8, 1999)     21

<u>Blendingwell Music, Inc. v. Moor-Law, Inc.,</u>
    612 F. Supp. 474 (D. Del. 1985)                     12, 20

<u>Broadcast Music, Inc. v. R. Bar of Manhattan, Inc.,</u>
    919 F. Supp. 656 (S.D.N.Y. 1996)                   22

<u>Commerce Nat'l Insurance Services v. Commerce Insurance Agency, Inc.,</u>
    214 F.3d 432 (3rd Cir. 1999)                        17

<u>Compendia Songs v. On Top Communications</u>, 2004 U.S.Dist. LEXIS
    25179 (D.Del. Nov. 15, 2004) (Sleet J.)             20, 22

<u>Dam Things from Denmark, aka Troll Company APS v. Russ Berry &</u>
    <u>Co., Inc.,</u>
    290 F.3d 548 (3rd Cir. 2002)                        12

<u>DirecTV, Inc. v. Yvette Cantu,</u>
    2004 U.S. Dist. LEXIS 22715 (W.D. Tex. 2004)        21

<u>F.W. Woolworth Co. v. Contemporary Arts, Inc.,</u>
    344 U.S. 228, 97 L.Ed. 276, 73 S. Ct. 222 (1952)       21

<u>Faberware Inc., v. Mr. Coffee, Inc.,</u>
    740 F.Supp. 291 (D.Del. 1990)                   16

<u>Ford Motor Co. v. Summit Motor Products, Inc.,</u>
    930 F.2d 277 (3rd Cir. 1991)                     12

<u>Interpace Corp. v. Lapp Inc.,</u>
    721 F.2d 460 (3rd Cir. 1983)                     19

<u>Int'l Bancorp LLC v. Societe des Bains de Mer et du Cercle des Etrangers</u>
    <u>a Monaco,</u>
    329 F.3d 359 (4th Cir. 2002)                      18

iv

Keene Corp. v. Paraflex Industries, Inc.,
        653 F.2d 822 (3rd Cir. 1981)                                                    17

M. Kramer Mfg. Co., Inc. v. Andrews,
        783 F.2d 421 (4th Cir. 1986)                                                    18

Midway Mfg. Co. v. Bandai-America, Inc.,
        546 F. Supp. 125 (D.N.J. 1982), cert. denied, 475 U.S. 1047 (1986)             12

Milene Music, Inc. v. Gotauco,
        551 F. Supp. 1288 (D. RI 1982)                                                 15

Nihon Keizai Shimbun, Inc. v. Comline Business Data Inc.,
        1998 U.S. Dist. LEXIS *6806 (S.D.N.Y. April 14, 1998)                          21

Odegard, Inc. v. Costikyan Classic Carpets,
        963 F. Supp. 1328 (S.D.N.Y. 1997)                                             15

Original Appalachian Artworks, Inc. v. J.F. Reichart, Inc.,
        658 F. Supp. 458 (Ed. Pa. 1987)                                               15

Quinto v. Legal Times of Washington, Inc.,
        511 F. Supp.579 (D. DC 1981)                                                   22

SecuraComm Consulting, Inc. v. Securacom Inc.,
        166 F.3d 182 (3rd Cir. 1999)                                                   19

Shire U.S., Inc. v. Barr Labs, Inc.,
        329 F.3d 348 (3rd Cir. 2003)                                                   16

Stratchborneo v. Arc Music Corp., 357 F. Supp. 1393, 1399 n. 6
        (S.D.N.Y. 1973)                                                                12

Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.,
        74 F.3d 488 (4th Cir. 1996)                                                    21

Wal-Mart Stores, Inc. v. Samara Brothers,
        529 U.S. 205, 205 S.Ct. 1339, 146 L.Ed.2d 182 (2000)                          17

Whelan Associates, Inc. v. Jaslow Dental Lab, Inc.,
        797 F.2d 1222 (3rd Cir. 1986)                                              12, 14

Yamate USA Corp. v. Sugerman,
        20 U.S.P.Q.2d 1590 (D.N.J. 1991)                                              12

v

Statutes

15 U.S.C. § 1051                                                         2

17 U.S.C. § 101                                                         2

28 U.S.C. § 1331                                                        1

28 U.S.C. § 1338                                                        1

28 U.S.C. § 1400 (a)                                                    1

28 U.S.C. §§ 1391                                                      1

Fed. R. Civ. P. 52(a)                                                 1

Other Authorities

3 Melville B. Nimmer, et al. Nimmer on Copyright § 12.11 [B][1].        13

4 Melville B. Nimmer, et al. Nimmer on Copyright § 139.2 (1972)         12

Plaintiff, Webloyalty.com, Inc. ("Webloyalty"), respectfully submits the following proposed findings of fact and conclusions of law pursuant to this Court's Order dated March 2, 2005.

## SUMMARY OF THE NATURE OF THE CASE

1)      This is an action for copyright infringement and unfair competition. Plaintiff, Webloyalty.com, Inc. ("Webloyalty"), alleges that it has two valid copyright registrations and that Defendant, Consumer Innovations LLC ("CI") willfully infringed those copyrights. Webloyalty also alleges that CI engaged in unfair competition in violation of the Lanham Act by willfully infringing the trade dress of two Webloyalty advertisements. The Court held a one day trial on February 22, 2005. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 and personal jurisdiction over the parties. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 (a). Having considered the documentary evidence and testimony, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

### A.      THE PARTIES

2)      Webloyalty is a Delaware corporation with its principal place of business at 101 Merritt 7, 5th Floor, Norwalk, Connecticut 06851. Webloyalty is an online provider of various membership discount programs to consumers. Trial Transcript ("Tr.") at 37-38.

3)      CI is a limited liability company organized and existing under the laws of the State of Arizona with a principal place of business at 7330 North 16th Street, Suite A120, Phoenix, Arizona 85020. CI is an online provider of various membership discount programs to consumers. Tr. at 88.

## B.    THE CLAIMS

4)    Webloyalty has alleged that CI's use of the CI Sell Page willfully infringed Webloyalty's U.S. Copyright Registration No. TX 5842219 the "Webloyalty Sell Page." PTX 1.

5)    Webloyalty has alleged that CI's use of the CI Banner willfully infringed Webloyalty's U.S. Copyright Registration No. TX 5875671 the "Webloyalty Banner." PTX 67.

6)    Webloyalty has alleged that CI engaged in unfair competition by willfully infringing the trade dress in the Webloyalty's banner advertisement and Webloyalty's sell page.

## C.    PROCEDURAL HISTORY

7)    On February 9, 2004, Webloyalty filed a Complaint and Motion for Temporary Restraining Order/Preliminary Injunction in this action alleging that CI had engaged in willful copyright infringement of the Webloyalty Sell Page pursuant to 17 U.S.C. § 101, et seq.; and unfair competition pursuant to 15 U.S.C. § 1051, et seq.; based upon CI's use of Webloyalty's trade dress in its banner advertisement and sell page. (D.I. 1-2)

8)    On February 10, 2004, this Court held a teleconference in which the Court discussed an expedited briefing schedule on the Temporary Restraining Order/Preliminary Injunction. During that teleconference CI raised the issue of whether the Court had personal jurisdiction over CI. (D.I. 12)

9)    On February 13, 2004 CI filed a motion to dismiss for lack of personal jurisdiction. (D.I. 16) The motion was fully briefed on April 12, 2004. (D.I. 26, 33)

10)    In a February 13, 2004 teleconference, the Court removed the hearing for the Temporary Restraining Order from the calendar based upon the revised CI Sell Page (PTX 5) and CI's representations that its banner has been significantly changed. (D.I. 12)

11)    On August 23, 2004, the day this Court had scheduled an oral hearing on CI's motion to dismiss for lack of personal jurisdiction, CI withdrew its motion to dismiss with prejudice. (D.I. 82)

12)    On October 12, 2004, CI filed a motion for summary judgment. (D.I. 91) The Court denied that motion on January 13, 2005. (D.I. 101)

13)    A trial was held on February 22, 2005. This Court found actual copying of the Webloyalty copyrights after the close of evidence. Tr. at 216.

### D.    COPYRIGHT    INFRINGEMENT    OF    THE WEBLOYALTY SELL PAGE

14)    Webloyalty is the owner of U.S. Copyright Registration No. TX 5842219, registered on November 20, 2003 with a date of first publication of September 15, 2003. PTX 1; Tr. at 73-74.

15)    Webloyalty personnel created the Webloyalty Sell Page.    Tr. 74. Webloyalty did not copy the Webloyalty Sell Page from any other source. Tr. at 77-78.

16)    Webloyalty began using the Webloyalty Sell Page in connection with the Walter Drake site on November 24, 2003. Tr. at 89.

17)    In late November 2003, List Services, a broker, approached CI regarding a potential post-buy marketing opportunity with Walter Drake. Tr. at 125. List Services told CI that Walter Drake was using Webloyalty as its current marketing partner and that CI would have the opportunity to compete against Webloyalty. Tr. at 125.

18)    Below is a reproduction of PTX 2A consisting of the Webloyalty Sell Page with the language identical to that found on the CI Sell Page highlighted in yellow. At trial, CI stipulated that the highlighted text is identical. Tr. at 50.

# Webloyalty's Sell Page









Webloyalty
v.
Consumer Innovations
C.A. No. 04-0090
Pltf. Demo. Trial
Exhibit 2A

PTX 2

19)     The post-buy marketing used in connection with Walter Drake involves the following steps: A consumer visits Walter Drake's website and makes a purchase. When the order is completed, a confirmation page appears advising that the purchase at the Walter Drake website has been completed. The confirmation page also has a banner, sometimes referred to as the "banner advertisement," created by Webloyalty that provides the consumer with an opportunity to learn about an offer from Reservations Rewards, a service owned and operated by Webloyalty. If the consumer clicks on the banner advertisement, Webloyalty's sell page for its Reservation Rewards service offers the consumer the opportunity to join Reservation Rewards. Tr. at 79-80.

20)     On December 16, 2003, Matthew Gordon, Director of Interactive Product Management of CI, made a purchase on the Walter Drake web site. He then clicked on the Webloyalty Banner, reviewed the Webloyalty Sell Page and joined Webloyalty's Reservations Rewards service. Mr. Gordon took these steps for the purpose of viewing the Webloyalty Banner and the Webloyalty Sell Page. Tr. at 122-23; PTX 36.

21)     On December 17, 2003, Mr. Gordon sent an e-mail to Hungry Mind, a company which designs web sites. Attached to that e-mail was Mr. Gordon's first draft of the CI Sell Page. PTX 43; Tr. at 130. This first draft was virtually identical to the Webloyalty Sell Page except for seven paragraphs which described the terms of CI's Traveler Innovations Program. Tr. at 121-122; PTX 43A. The identical language included Webloyalty's customer service telephone number in a sentence which reads as follows: "If, at any time, you are not completely satisfied during your trial or thereafter simply call Traveler Innovations toll free at 1-888-688-5995 to let us know you wish to cancel your monthly membership benefits..." PTX 43A; Tr. at 133.

22) CI later added photographs, borders and other graphics to the draft CI Sell Page. The order and sequence of text and graphics were arranged in such a way so as to create a similar look and feel to the Webloyalty Sell Page. Tr. at 121.

23) Prior to going live with Walter Drake on January 15, 2004, CI generated a number of drafts of the CI Sell Page. In one draft of the CI Sell Page, CI changed the language so that it would not be identical to the language in the Webloyalty Sell Page. PTX 44. A comparison of the January 13 draft sent to Hungry Mind with the CI Sell Page that went live with Walter Drake on January 15, 2004, makes it apparent that seven changes CI made in the first few paragraphs of the January 13 draft rendered that portion of the CI Sell Page identical to the corresponding portions of the Webloyalty Sell Page. Tr. at 139-145; PTX 44A.

24) Mr. Gordon and Mr. Edwards (CI's Director of Interactive Product Management and President, respectively) testified – both at deposition and at trial – that CI did not copy portions of the Webloyalty Sell Page. Tr. at 126; 127; 132-133; 140-141; 142; 144; 145; 169; 180; and 199. The Court does not find this testimony credible. The Court finds that CI engaged in actual copying of the Webloyalty Sell Page.

25) The Court also finds that CI had access to the Webloyalty Sell Page and that there are substantial - - indeed overwhelming - - similarities between the CI Sell Page and the Webloyalty Sell Page.

26) The Court finds the CI Sell Page has a similar look and feel to the Webloyalty Sell Page. Tr. at 120-21.

### E.    COPYRIGHT    INFRINGEMENT    OF    THE WEBLOYALTY BANNER

27)    Webloyalty is the owner of U.S. Copyright Registration No. TX 5875671 registered on February 17, 2004 with a date of first publication of December 9, 2003.  PTX 67; Tr. at 91.

28)    Webloyalty began using the Webloyalty Banner in connection with the Walter Drake site on December 9, 2003.  Tr. at 92.

29)    Webloyalty personnel created the Webloyalty Banner and did not copy text from outside of Webloyalty in creating the Webloyalty Banner.  Tr. at 80.

30)    The Webloyalty Banner is critical to Webloyalty's business because if a consumer is not motivated by the banner to click on it, he or she will never see the Webloyalty Sell Page and will not have an opportunity to join a Webloyalty service.  Tr. at 80-81.

31)    Below is a reproduction of PTX 6A consisting of a copy of the Webloyalty Banner and the CI Banner with the language on each that is identical highlighted in yellow.  At trial CI stipulated that the highlighted text is identical.  Tr. at 50.



32)    Mr. Gordon testified that Walter Drake changed the name of the source on the banner from Reservation Rewards to Traveler Innovations to "have a clean test off of the confirmation page." Tr. at 171-172. Mr. Gordon never asked whether Walter Drake had any intellectual property rights in the Banner even though he had seen Webloyalty using the same Banner before he had clicked on it in December 2003. Tr. at 148.

33)    Mr. Gordon never asked Walter Drake if CI could make additional changes to the banner. He understood that CI could have told Walter Drake it did not want to use the banner if it believed that it was wrong to do so. Tr. at 148-149; 171-172.

34)    Walter Drake had no intellectual property rights in or to the Banner. There is no evidence in the record that Walter Drake required CI to use the banner or would not have allowed a test with a different banner. Walter Drake had previously done a head-to-head test against Webloyalty in which the company being tested (InQ) used a pop-up advertisement that was not similar to the Webloyalty Banner. Tr. at 81-82.

35)    The Court finds that CI engaged in actual copying of the Webloyalty banner.

36)    The Court also finds that CI had access to the Webloyalty Banner and that the CI Banner and the Webloyalty Banner are identical but for the service name.

37)    The Court finds that the CI Banner has a similar look and feel to the Webloyalty Banner.

## F.    **WILLFULNESS**

38)    As of December 2003, CI knew that copying was wrong. Tr. at 122; 124; 176; 178. CI understood that it was wrong to "take a couple of paragraphs from somebody else's marketing creative." Tr. at 177.

39)    Mr. Gordon knew what a copyright symbol meant and that it would be inappropriate to take paragraphs from a sell page which had a copyright notice on it. Tr. at 122-124.

40)    Despite the overwhelming similarities between the Webloyalty Sell Page and the CI Sell Page and the evidence discussed above regarding the drafts of CI's Sell Page (including the evidence that the first draft of the CI Sell Page (PTX 43) had Webloyalty's phone number), Mr. Gordon and Mr. Edwards repeatedly testified, under oath, that Mr. Gordon did not copy the Webloyalty Sell Page.   Tr. at 126; 127; 132-133; 140-141; 142; 144; 145; 169; 180; and 199. The Court finds that this testimony is not credible.

41)    Both  Mr. Edwards and Mr. Gordon refused to admit that what they had done was wrong and testified that they might do the same thing again in the future.  Tr. at 151; 179-180; 183-184.

### G.    UNFAIR    COMPETITION    –    TRADE    DRESS INFRINGEMENT  OF  THE  WEBLOYALTY  SELL PAGE AND BANNER ADVERTISEMENT.

42)    A sell page can be designed in a multitude of ways which would not infringe on Webloyalty's trade dress. Tr. at 97; 138; 210.

43)    Since the inception of Webloyalty's Reservation Rewards service, over 35 million views of the Reservation Rewards sell page by consumers have occurred. Tr. at 89. From the time Reservation Rewards went live on Walter Drake until the time the CI Sell Page went live on Walter Drake, there were more than 175,000 views by consumers of the Reservation Rewards sell page from the Walter Drake confirmation page. Id.

44)    From November 24, 2003, the time the Webloyalty Sell Page (PTX 2) went live on Walter Drake, until January 15, 2004, the date CI launched its sell page, there were

over 18,000 views of the Webloyalty Sell Page. Tr. at 89. Similar Webloyalty banners on other client sites from November 2003 through January 15, 2004 were viewed almost 260,000 times. Tr. at 90.

45)    Webloyalty has never given any company permission to use the text of the Webloyalty Sell Page or the look and feel of the Webloyalty Sell Page. Tr. 90. Webloyalty employees testified that to do so would be to give away Webloyalty's competitive advantage. Tr. at 90-91.

46)    CI intentionally copied the Webloyalty Sell Page and the Webloyalty Banner.

47)    Customers have been confused by the similarity of the banners and sell pages. Tr. at 207-209.

48)    The Traveler Innovations and Reservation Rewards services are both membership clubs for discounts on travel. Tr. at 191. CI's Traveler Innovations service cost $7.00 per month. Tr. at 88, and the Reservation Rewards service cost $9.00 per month. Tr. at 89.

49)    Traveler Innovations and Reservation Rewards are both travel-related discount programs and competed directly with each other when both were reachable from the Walter Drake confirmation page. Tr. at 120-21.

## H.    ACTUAL DAMAGES

50)    Webloyalty's lost revenues for the time that CI's Sell Page and Banner went live on the Walter Drake site totaled $24,500. Tr. at 204-205; PTX-32.

51)    There are additional, hard-to-quantify damages based on potential customer confusion. Tr. at 207-209.

## CONCLUSIONS OF LAW

**A.   CI INFRINGED WEBLOYALTY'S VALID COPYRIGHT REGISTRATIONS FOR THE WEBLOYALTY SELL PAGE AND WEBLOYALTY BANNER.**

**(a)   The Webloyalty Registrations (TX 5842219 and TX 5875671) are Valid.**

52)    In an action for copyright infringement under 17 U.S.C. § 501, a plaintiff bears the burden of proving, by a preponderance of the evidence, that the registrations are valid and that the defendant copied the registered works. Dam Things from Denmark, aka Troll Company APS v. Russ Berry & Co., Inc., 290 F.3d 548, 561 (3rd Cir. 2002) (citing Whelan Associates, Inc. v. Jaslow Dental Lab, Inc., 797 F.2d 1222, 1231 (3rd Cir. 1986)).

53)    Webloyalty's copyright registrations (Registration No. TX 5842219 and Registration No. TX 5875671) are prima facie evidence of validity of the copyrights and ownership of the material. Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 290-91 (3rd Cir. 1991); Blendingwell Music, Inc. v. Moor-Law, Inc., 612 F. Supp. 474, 480 (D. Del. 1985) ("registrations or certificates of copyright constitute prima facie evidence of originality, authorship and compliance with statutory formalities.")

54)    CI has the burden of overcoming the presumption of originality by showing that Webloyalty copied the Webloyalty Sell Page and/or the Webloyalty Banner from some other source. Yamate USA Corp. v. Sugerman, 20 U.S.P.Q.2d 1590, 1594 (D.N.J. 1991) (citing Midway Mfg. Co. v. Bandai-America, Inc., 546 F. Supp. 125, 140 (D.N.J. 1982), cert. denied, 475 U.S. 1047 (1986)); Stratchborneo v. Arc Music Corp., 357 F. Supp. 1393, 1399 n. 6 (S.D.N.Y. 1973) (citing 4 Melville B. Nimmer, et al. Nimmer on Copyright § 139.2 (1972)) (Evidence of a certificate of copyright registration shifts "the burden of going forward . . . to defendants, who must prove the work was not original.") A defendant cannot rely on

unsupported argument to counter the <u>prima facie</u> evidence. Nor can defendant offer evidence of prior similar works without evidence that plaintiff copied those works. 3 Melville B. Nimmer, et al. <u>Nimmer on Copyright</u> § 12.11 [B][1].

55)     There is no evidence that the Webloyalty Sell Page or the Webloyalty Banner registrations are not valid.

56)     As the Court has previously held, the defenses of merger and <u>scenes a faire</u> are not applicable to this case:

> For either doctrine to apply, Consumer Innovations must establish that there is a limited, if not singular, manner to express the ideas presented on the sell page. It has not made any such showing. The evidence presented by Consumer Innovations, if anything, proves the opposite. Consumer Innovations provides two examples of sell pages that offer a $10 incentive for joining a membership club and inform the reader how to join. These sell pages clearly show that there are other ways in which those ideas can be expressed. Neither of these sell pages uses the same text or arrangement as Webloyalty's copyrighted page. While the 'external factors' described by Consumer Innovations may provide the central ideas, there apparently are a number of ways to express them.

January 13, 2005 Memorandum Order denying Defendant's Motion for Summary Judgment (D.I. 101) at 11-12.

57)     U.S. Copyright Registration No. TX 5842219  for the Webloyalty Sell Page is valid.

58)     U.S. Copyright Registration No. TX 5875671 for the Webloyalty Banner is valid.

### (b)     CI Copied Original Elements from the Copyrighted Works.

59)     As the Court stated after the close of evidence, "the record is overwhelming that there was actual copying here." Tr. at 216.

60)    The Court concludes that CI engaged in actual copying of both the text and the overall look and feel of the Webloyalty Sell Page. Tr. at 216.

61)    The Court concludes that CI engaged in actual copying of both the text and the overall look and feel of the Webloyalty Banner. Tr. at 216.

62)    Copyright laws protect the expression of ideas not the ideas themselves. Whelan, 797 F.2d at 1234:

> . . . [t]he line between idea and expression may be drawn with reference to the end sought to be achieved by the work in question, In other words, the purpose or function of a utilitarian work would be the work's idea, and everything that is not necessary to that purpose or function would be part of the expression of that idea . . . Where there are various means of achieving the desired purpose, then the particular means chosen is not necessary to the purpose; hence, there is expression, not idea.

Id. at 1235 (emphasis in original).

63)    Webloyalty's idea to offer a cash incentive to entice individuals to join a membership club and the idea of informing a reader how to join is not protectable under the copyright laws. However, Webloyalty's arrangement of the page, selection of text and font are protectable expression.

64)    Webloyalty's idea to attract a consumer's attention with a button is not protectable under the copyright laws. However, Webloyalty's arrangement of the banner, selection of text and font are protectable expression.

65)    The Court concludes that the Webloyalty Sell Page, TX 5842219, and the Webloyalty Banner, TX 5875671, are valid copyright registrations.

66)    CI's use of the CI Sell Page and the CI Banner infringed those valid copyright registrations.

67)    CI's defense that Walter Drake required CI to use the infringing banner is not factually supported or legally sufficient.

**B.    CI's INFRINGEMENT OF WEBLOYALTY'S BANNER AND SELL PAGE COPYRIGHT REGISTRATIONS WAS WILLFUL.**

68)    An infringement is willful when a defendant engages in acts that infringe the copyright, knowing that those actions would infringe the copyright. Original Appalachian Artworks, Inc. v. J.F. Reichart, Inc., 658 F. Supp. 458 (Ed. Pa. 1987); Milene Music, Inc. v. Gotauco, 551 F. Supp. 1288 (D. RI 1982).

69)    To establish willful infringement, Webloyalty must show by a preponderance of the evidence that CI either knew its conduct constituted copyright infringement or acted with reckless disregard for whether its conduct infringed upon Webloyalty's copyrights. Original Appalachian Artworks, Inc. v. J.F. Reichart, Inc., 658 F. Supp. 458 (Ed. Pa. 1987); Milene Music, Inc. v. Gotauco, 551 F. Supp. 1288 (D. RI 1982).

70)    Willfulness can be found if the defendant uses dishonest actions to try to hide the infringement from the plaintiff and/or the Court. Odegard, Inc. v. Costikyan Classic Carpets, 963 F. Supp. 1328 (S.D.N.Y. 1997).

71)    The evidence definitively establishes that CI's infringement was willful. Mr. Gordon and Mr. Edwards each testified that they understood what copyright protection is. Tr. at 122; 123; 124. Mr. Gordon testified that he knew copying was wrong. Tr. at 122; 124. Mr. Edwards testified first that copying was wrong (Tr. at 176; 177); but that copying in this instance was not wrong and that he would do it again, if given the opportunity, without the concern of a court litigation. Tr. at 183. CI also tried to hide the infringement by not producing documents. Tr. at 135; 186. CI repeatedly denied copying Webloyalty's material despite

Webloyalty's phone number appearing in the draft. Tr. at 126; 127; 132-133; 140-141; 142; 144; 145; 169; 180; and 199. The Court finds the testimony of Mr. Gordon and Mr. Edwards on the issue of copying not credible. As the Court stated to Mr. Edwards and Mr. Gordon, on the record their testimony "borders, gentlemen, if not crosses the border, into a criminal act, perjury, to look at a sheet of paper which is a draft of your sell page, Ex. 43, which contains Webloyalty's phone number in it and assert that is not an instance of copying. It's a stunning position to take. I do not understand what motivated that testimony here in court today, but it is, to put it mildly, incredible." Tr. at 216.

72)    CI's infringement of the Webloyalty Sell Page, TX 5842219    and Webloyalty Banner, TX 5875671 was willful.

### C.    CI'S USE OF WEBLOYALTY'S SELL PAGE AND BANNER ADVERTISEMENT CONSTITUTE WILLFUL INFRINGEMENT OF WEBLOYALTY'S TRADE DRESS.

73)    To prove unfair competition by use of trade dress, Webloyalty must show by a preponderance of the evidence that the trade dress is valid and protectable and that CI's use of Webloyalty's trade dress is likely to cause confusion among purchasers as to the source of the club membership. Faberware Inc., v. Mr. Coffee, Inc., 740 F.Supp. 291 (D.Del. 1990); Shire U.S., Inc. v. Barr Labs, Inc., 329 F.3d 348 (3rd Cir. 2003).

### (a)    Validity of the Trade Dress

74)    To establish the validity of its trade dress, Webloyalty must show by a preponderance of the evidence that its trade dress is non-functional and that it is inherently distinctive or has acquired secondary meaning. Faberware, 740 F.Supp at 296.

75)    An inquiry regarding functionality should focus on the extent to which a design feature is related to a utilitarian function of the product or feature. Keene Corp. v. Paraflex Industries, Inc., 653 F.2d 822 (3rd Cir. 1981).

76)    Webloyalty's trade dress is non-functional.

77)    An inherently distinctive trade dress is a word, symbol, device or combination thereof, which intrinsically identifies a particular source of a good in the market. Wal-Mart Stores, Inc. v. Samara Brothers, 529 U.S. 205, 205 S.Ct. 1339, 146 L.Ed.2d 182 (2000). An inherently distinctive trade dress is one that almost automatically tells a consumer that it refers to a brand or a source for a product, such that consumers will be predisposed to equate the trade dress with the source of a product. Id.

78)    In determining inherent distinctiveness, this Court must consider the total visual impression of the trade dress, not the each element of it in isolation. Id. Inherently distinctive trade dress often uses common, non-distinctive elements when considered individually. It is the combination of elements and the total impression that the trade dress conveys to the consumer that determines if it is distinctive. Id.

79)    The Court may find that while the trade dress is not inherently distinctive, the trade dress has acquired distinctiveness through secondary meaning. Secondary meaning is the recognition of the source that the design has among prospective purchasers. Commerce Nat'l Insurance Services v. Commerce Insurance Agency, Inc., 214 F.3d 432 (3rd Cir. 1999).

80)    Trade dress acquires secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective purchasers is not the product itself, but the identification of the product with a single source, regardless of whether customers know who or what that source is. Id. Factors to be considered in determining secondary

meaning of trade dress include: (1) copying by the defendant; (2) purchaser perception; (3) advertising; (4) extent of use; (5) exclusivity; (6) customer surveys and testimonies; (7) use of the claimed trade dress in trade journals; (8) size of company and number of sales; (9) number of customers; (10) actual confusion. Id.

81)    A defendant who "directly and intentionally copies another's trade dress has the burden of refuting a presumption that the trade dress has secondary meaning." Int'l Bancorp LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359, 371 (4th Cir. 2002) (citing M. Kramer Mfg. Co., Inc. v. Andrews, 783 F.2d 421 (4th Cir. 1986)).

82)    The Webloyalty Sell Page and Banner have secondary meaning. The Court's finding is based upon the following: (1) CI intentionally copied the Webloyalty Banner and the Webloyalty Sell Page; (2) the number of times the sell page and banner have been viewed by consumers; and (3) the actual confusion of Webloyalty customers.

83)    Having found that Webloyalty's trade dress is nonfunctional and has secondary meaning, the Court concludes that Webloyalty's trade dress in its banner and sell page are valid and protectable.

### (b)    Infringement of the Trade Dress

84)    The Court considers the following factors in determining whether there is a likelihood of confusion between CI's use and Webloyalty's use of the respective sell pages and banners: (1) the similarities of the trade dresses; (2) defendant's intent; (3) the relatedness of the services; (4) marketing and advertising channels; (5) that parties' sales efforts; (6) purchasers' degree of care; (7) the strength of plaintiffs' trade dress; (8) actual confusion between the trade dress; and (9) the length of time without actual confusion. A&H Sportswear, Inc. v. Victoria's

Secret Stores, Inc., 237 F.3d 198 (3rd Cir. 2002) (citing, Interpace Corp. v. Lapp Inc., 721 F.2d 460 (3rd Cir. 1983)).

85)    The Court concludes that a likelihood of confusion exists from CI's use of the CI Banner and the CI Sell Page. A comparison of the parties' sell pages (PTX 2 and PTX 3) and a comparison of the parties' banners (PTX 6 and PTX 7) shows the similarities of the respective trade dress. The willfulness of CI's actions establishes CI's intent to trade off of the good will Webloyalty derived from its trade dress. Webloyalty's Reservation Rewards service and CI's Traveler Innovations service offer consumers a similar type of discount on travel related purchases. Tr. at 191. The channels of trade for these services is identical because they both were offered from the same source – Walter Drake. Tr. at 47; 121. There has been actual confusion as a result of the similarity of the banners and sell pages. Tr. at 207-209. Finally, because the cost of the services was minimal (less than $10 per month) the purchaser's degree of care is slight. Tr. at 88-89.

86)    CI has engaged in unfair competition. Its use of the CI Sell Page and CI Banner infringes Webloyalty's valid trade dress and is likely to cause confusion among consumers.

### (c)    CI's Infringement Was Willful Infringement

87)    Infringement is willful when the defendant engages in acts that infringe the trade dress with a deliberate disregard of the owner's rights. SecuraComm Consulting, Inc. v. Securacom Inc., 166 F.3d 182 (3rd Cir. 1999). Willfulness occurs when the use of the trade dress was unnecessary and done in a way that was calculated to appropriate or benefit from the goodwill the owner has nurtured. Id.

88)    CI's actions evidence that CI had a deliberate disregard for Webloyalty's property rights. CI copied Webloyalty's advertisements, lied about it, and attempted to cover it up with further lies. The Court concludes that CI's infringement of Webloyalty's trade dress was willful.

### D.    WEBLOYALTY IS ENTITLED TO THE MAXIMUM AMOUNT OF STATUTORY DAMAGES ALLOWED UNDER THE COPYRIGHT ACT.

89)    Webloyalty has elected statutory damages for its copyright infringement claim. The Court can award up to $150,000 for willful infringement of the Webloyalty Sell Page copyright registration (TX 5842219) and $150,000 for willful infringement of the Webloyalty Banner copyright registration (TX 5875671). 17 U.S.C. § 504.

90)    Two factors are generally considered in determining the amount of damages appropriate to "vindicate statutory policy": (1) the deterrent value of the award and (2) the willful nature of defendant's conduct. Blendingwell Music Inc. v. Moor-Law, Inc., 612 F.Supp. 474, 486 (D.Del. 1985).

91)    "[A]n award of statutory damages serves two purposes. It compensates the plaintiff for the infringement of its copyright while, at the same time, serving as a deterrent by punishing the defendant of its willful conduct." Compendia Songs v. On Top Communications, 2004 U.S.Dist. LEXIS 25179 *10-11 (D.Del. Nov. 15, 2004) (Sleet J.) "[W]hen determining the appropriate level of statutory damages, . . . normally it is the blameworthiness of the defendants which weighs the heaviest in the court's analysis." Id. at *10.

92)    "As several district courts have observed, it is important to place infringers on notice that 'it costs less to obey the copyright laws than to violate them.'" Id. at *12.

93) Statutory damages are awarded when no actual damages are proven, or when actual damages are difficult to calculate. DirecTV, Inc. v. Yvette Cantu, 2004 U.S. Dist. LEXIS 22715 (W.D. Tex. 2004) (citing F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 231-32, 97 L.Ed. 276, 73 S. Ct. 222 (1952)).

94) In determining the appropriate level of statutory damages, it is proper to consider "any misleading or false statements made by defendants." Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc., 74 F.3d 488, 496 (4th Cir. 1996); Nihon Keizai Shimbun, Inc. v. Comline Business Data Inc., 1998 U.S. Dist. LEXIS *6806 (S.D.N.Y. April 14, 1998); Almond Int'l Inc. v. Arpas Int'l Ltd., 1999 U.S. Dist. LEXIS *102170 (S.D.N.Y. July 8, 1999).

95) In determining the amount of statutory damages to be awarded, the Court considers the following: (1) CI knowingly and intentionally copied language from Webloyalty's Sell Page and its banner advertisement; (2) CI testified falsely under oath in its deposition and in trial about that copying; (3) CI failed to produce PTX 43, the first draft of its Sell Page which has Webloyalty's customer service telephone number in it; and (4) both Mr. Edwards and Mr. Gordon lack any remorse for their actions and have testified that they would do this again but for the fear of litigation. Tr. at 151; 179-180; 183-184.

96) CI's willful infringement and the need for a deterrent effect because of CI's lack of remorse necessitate an award of the maximum amount of statutory damages permitted under 15 U.S.C. § 504.

97) The Court concludes Webloyalty shall be awarded $150,000 for willful infringement of the Webloyalty Sell Page and $150,000 for willful infringement of the Webloyalty Banner.

**E.   WEBLOYALTY IS ENTITLED TO ATTORNEYS'
FEES UNDER THE COPYRIGHT ACT.**

98)   "[A]n award of attorney's fees helps to ensure that all litigants have equal access to the courts to vindicate their statutory rights.  It also prevents copyright infringements from going unchallenged where the commercial value of the infringed work is small and there is no economic incentive to challenge an infringement through expensive litigation. . . in addition, an award of attorneys fees serves to penalize the losing party as well as to compensate the prevailing party."  Quinto v. Legal Times of Washington, Inc., 511 F. Supp.579, 581 (D. DC 1981) (internal citations omitted).

99)   "An award of reasonable fees and costs tends to be the rule rather than the exception in actions for copyright infringement."   Compendia Songs v. On Top Communications, 2004 U.S. Dist. LEXIS 25179 *13 (D. Del. 2004) (Sleet, J.).   The twin considerations of compensation and deterrence should be taken into account in determining an appropriate amount to award.  Id. citing Broadcast Music, Inc. v. R. Bar of Manhattan, Inc., 919 F. Supp. 656, 660-61 (S.D.N.Y. 1996). "In particular, when there appears to be significant merit to a plaintiff's case, the court should focus its analysis on whether the defendant was acting intentionally, willfully or in bad faith."  Id. citing Broadcast Music at 661.

100)   Webloyalty's case has significant merit.  The Court finds overwhelming evidence that CI copied Webloyalty's sell page.  Tr. at 216:2-3.  Webloyalty is entitled to be compensated for protecting its intellectual property.

101)   Despite the overwhelming evidence of copying, both Mr. Gordon and Mr. Edwards testified at deposition and then again at trial that the CI sell page was not copied from Webloyalty.  As the Court stated at the conclusion of trial, their testimony bordered "if not

crosses the border, into a criminal act, perjury." Tr. at 216:10-11. Such testimony is probative of CI's state of mind and the importance of considerations of deterrence.

102)    CI's litigation misconduct unnecessarily increased the cost of the litigation and further supports a full award of attorneys' fees. CI's litigation misconduct included, inter alia: CI filed a motion to dismiss for lack of personal jurisdiction. The motion was supported by a misleading declaration by Mr. Edwards. After the motion was fully briefed and jurisdictional discovery was taken, CI withdrew its motion with prejudice on the morning of oral argument. Tr. at 188-189; 190-191. CI also filed a motion for summary judgment. CI argued, without evidence and based upon incorrect legal positions, that Webloyalty's sell page did not contain copyrightable subject matter.

103)    CI failed to comply with its obligations to assist in preparing the final pretrial order, and failed timely to provide proposed jury instructions. See Application of Plaintiff Webloyalty.com for Attorneys' Fees and Costs. CI also failed to provide its exhibit list, objections to Webloyalty's exhibits and other key litigation materials until after the date of filing of the pretrial order. Id.

104)    Although Webloyalty requested on December 30, 2004 that CI consent to a trial of this matter before the Court rather than a jury, CI initially declined and then changed its position on February 18, 2005 - - the last business day before trial - - thus causing Webloyalty to incur costs relating to both a jury and non-jury trial.

105)    The Court has reviewed the Petition for Attorneys Fees along with the supporting declarations of Mr. Blumenfeld and Mr. Lieberman. The Court finds the fees and costs necessary and reasonable and awards Webloyalty $593,645.25 in attorneys fees and $53,460.59 in costs plus fees and costs incurred in March, 2005.

### F.    WEBLOYALTY IS ENTITLED TO TREBLED ACTUAL DAMAGES UNDER THE LANHAM ACT.

106)    The Lanham Act sets out what the Court must consider in determining damages.

> "The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of costs or deduction claimed. In assessing damages, the court may enter judgment, according to the circumstances of the case for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive, the court may in its discretion enter judgment for a sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorneys' fees to the prevailing party."

15 U.S.C. §1117.

107)    Webloyalty's lost revenues for the time that CI's Sell Page and Banner were alive on the Walter Drake site totaled $24,500. Tr. at 204-205; PTX-32. There are additional hard to quantify damages based on potential confusion. Tr. at 207-208.

108)    The Court finds this is an exceptional case.

109)    Webloyalty is also entitled to be awarded its attorneys fees with respect to the Lanham Act violations.

110)    The Court awards Webloyalty to $24,500 in actual damages and as this is an exceptional case under the Lanham Act, the Court trebles those damages to $73,500 because of the exceptional nature of this case.

## G.    INJUNCTIVE RELIEF

111)    The Court enters a permanent injunction against Consumer Innovations its agents, servants, employees, successors-in-interest, subsidiaries and all persons action under, in concert or active participation with or for them from using the CI Sell Page, Interim CI Sell Page, CI Banner and anything confusingly similar to and/or substantially similar to the Webloyalty Sell Page and/or the Webloyalty Banner depicted in TX 5842219 and TX 5875671, respectively.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/  Jack B. Blumenfeld (#1014)
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
 (302) 658-9200
jblumenfeld@mnat.com
*Attorneys for Plaintiff*
*Webloyalty.com, Inc.*

OF COUNSEL:

Steven Lieberman
Anne M. Sterba
Rothwell, Figg, Ernst & Manbeck
1425 K Street, NW
Suite 800
Washington, DC  20005
(202) 783-6040

March 16, 2005

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on March 16, 2005 I electronically filed

Proposed Findings of Fact and Conclusions of Law Submitted by Plaintiff Webloyalty.com, Inc.

with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the

following:

> Daniel A. Griffith, Esquire
> Marshall, Dennehey, Warner, Coleman & Goggin
> 1220 N. Market Street, 5th Floor
> Wilmington, DE 19801

I also certify that copies were caused to be served on March 16, 2005 upon the

following in the manner indicated:

> BY HAND

> Daniel A. Griffith, Esquire
> Marshall, Dennehey, Warner, Coleman & Goggin
> 1220 N. Market Street, 5th Floor
> Wilmington, DE 19801

> /s/    Jack B. Blumenfeld (#1014)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
> jblumenfeld@mnat.com